UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
BETH BOGART,

                    Plaintiff,

       - against -

THE CITY OF NEW YORK, a municipal entity;
and Detective NICHOLAS GRENIER (Shield
2006), in his individual capacity,

                    Defendants.
----------------------------------------X

**MEMORANDUM AND ORDER**

13 Civ. 1017 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Beth Bogart moves for leave to amend her complaint against the City of New York (the "City") and Detective Nicholas Grenier of the New York Police Department ("NYPD"). The presently operative complaint asserts claims against Grenier under 42 U.S.C. § 1983 for violations of Bogart's First, Fourth, and Fourteenth Amendment rights during an encounter between Bogart and Grenier on the morning of November 15, 2011, and also against both Grenier and the City under state law. The proposed amendment would principally add (1) First, Fourth, and Fourteenth Amendment § 1983 claims against three new defendants who, on that date, held high office in City government, namely then-Mayor Michael Bloomberg, then-Deputy Mayor Caswell Holloway, and then-Corporation Counsel Michael Cardozo (collectively the "City Officials"); and (2) a <u>Monell</u> claim against the City. For the following reasons, the

motion is granted to the extent that it is unopposed and is denied in remaining part.

## I.  BACKGROUND

The following undisputed facts set the scene.[1] Zuccotti Park (or the "Park") is a "privately owned public space" owned by Brookfield Properties ("Brookfield") in lower Manhattan that was the epicenter of the Occupy Wall Street (or "Occupy") demonstrations. (See Proposed Second Amended Complaint ("PSAC"), Moskovitz Decl. Ex. 1, at ¶¶ 22, 25; Pl.'s Mem. 10; Defs.' Mem. 4.) Starting in September 2011, the Park came to be inhabited around the clock by Occupy protesters, who brought possessions including tents, sleeping bags, generators, and other camping equipment into the Park. (See Pls.' Mem. 3, 6-7; Defs.' Mem. 11; Moskovitz Decl. Ex. 4, at 2; id. Ex. 9, at 1-2.)

On November 15, 2011, at 1:00 a.m., the NYPD closed Zuccotti Park temporarily for cleaning, instructing those present to remove their belongings. (See PSAC ¶ 31; Pl.'s Mem. 2; Moskovitz Decl. Ex. 9, at 1.) Protesters were notified that Brookfield's rules (apparently promulgated after the Occupy

---

[1]  Citations to the record refer to plaintiff's memorandum of law filed on January 28, 2015, ECF No. 37 ("Pl.'s Mem."); the declaration of Joshua S. Moskovitz, Esq., dated January 28, 2015, ECF No. 38 ("Moskovitz Decl."), and exhibits annexed thereto; defendants' memorandum of law dated February 27, 2015, ECF No. 40 ("Defs.' Mem."); the declaration of Andrew Lucas, Esq., dated February 27, 2015, ECF No. 41 ("Lucas Decl."), and exhibits annexed thereto; and plaintiff's reply memorandum of law dated March 13, 2015, ECF No. 43 ("Pl.'s Reply Mem.").

demonstrations began) prohibiting camping, sleeping, and storing personal property in the Park would henceforth be enforced. (See Moskovitz Decl. Ex. 3, at 2; id. Ex. 4, at 2; id. Ex. 9, at 1.)  The NYPD and the New York Sanitation Department removed the remaining items of personal property from the Park.  (See id. Ex. 9, at 1.)   In a public statement later that day, Mayor Bloomberg stated that the decision to clear the Park and to enforce Park rules was motivated by health and safety concerns. (See id. Ex. 9, at 1.)

At 6:30 a.m., Occupy-associated individuals including Jennifer Waller obtained an ex parte temporary restraining order (the "TRO") from Justice Lucy Billings of Supreme Court, New York County.[2]  (Moskovitz Decl. Ex. 3.)  The TRO directed the City to refrain from "[e]victing protesters," "[e]nforcing the 'rules' published after the occupation began," and "[p]reventing protesters from re-entering the park with tents and other property previously utilized."  (Id. at 2.)  Justice Billings set a hearing for 11:30 a.m.  (See id.)

Mayor Bloomberg had planned to make an announcement concerning the closure and reopening of Zuccotti Park at an 8:00 a.m. press conference.  (See PSAC ¶ 32; Pls.' Mem. 3-4; Moskovitz Decl. Ex. 2; Deposition of Sheryl Neufeld, Esq.

---

[2]     Although a full list of parties to the state-court action is not in this Court's record, it has not been suggested that Bogart was a petitioner in that action.

("Neufeld Dep."),[3] at 53:16-18, 54:8-55:3.)   However, the Mayor became aware of the TRO shortly before he spoke at the press conference.[4]   After the Mayor consulted with the two other City Officials, he announced that in light of the "court order . . . enjoining us from enforcing [the Park owner's] rules, . . . the Park will remain closed until we can clarify that situation." (Pls.' Mem. 3-4.)   As the Mayor later stated, "[t]he opening of the park was delayed due to legal action taken against the City." (Moskovitz Decl. Ex. 2.)

Shortly after noon, the scheduled hearing in the _Waller_ matter was held before Justice Michael D. Stallman of Supreme Court, New York County.   (_See_ Pl.'s Mem. 3; Moskovitz Decl. Ex. 4, at 3.)   Counsel appeared at the hearing for the petitioners, the City, Brookfield, and certain intervenors.   (_See_ Moskovitz Decl. Ex. 5, at 1-2.)   In a reasoned, written decision issued that afternoon, Justice Stallman denied the _Waller_ petitioners' application to extend the TRO.   _See_ _In re Waller v. City of N.Y._, 933 N.Y.S.2d 541 (Sup. Ct. N.Y. Cty. Nov. 15, 2011) ("_Waller_").   Justice Stallman held that, even "assuming arguendo[] that [Brookfield's] maintenance of the [Park] must

---

[3]     The Neufeld deposition is relied on by both plaintiff, who offers excerpts of the transcript as Exhibit 12 to the Moskovitz Declaration, and defendants, who offer the full transcript as Exhibit B to the Lucas Declaration.

[4]     Apparently, the City was not served with the TRO until 7:55 a.m., and the City Officials may have first learned of it from a reporter at the press conference scheduled for 8:00 a.m.   (_See_ Pl.'s Mem. at 3 n.2; Transcript of November 15, 2011 hearing in _Waller_ (Moskovitz Decl. Ex. 5), at 49:5-7; Deposition of Sheryl Neufeld (Moskovitz Decl. Ex. 12), at 21:12-14, 44:5-9.)

not violate the First Amendment," the petitioners had failed to "demonstrate[] that the rules adopted by the owners of the property, concededly after the demonstrations began, are not reasonable time, place, and manner restrictions permitted under the First Amendment."   Id. at 544-45.   Justice Stallman further held:

> The movants have not demonstrated that they have a First Amendment right to remain in Zuccotti Park, along with their tents, structures, generators, and other installation to the exclusion of the owner's reasonable rights and duties to maintain Zuccotti Park, or to the rights to public access of others who might wish to use the space safely.   Neither have the applicants shown a right to a temporary restraining order that would restrict the City's enforcement of law so as to promote public health and safety.

Id. at 545.   Although Justice Stallman set a schedule for further proceedings, see id. at 543, there were (according to counsel at our oral argument) no further judicial decisions in the Waller matter.

Later in the day, the City re-opened Zuccotti Park.   (See Pls.' Mem. 4; Moskovitz Decl. Ex. 2.)


## A.   The Corrected Amended Complaint

The presently operative complaint is the Corrected Amended Complaint dated August 6, 2013, ECF No. 7 ("CAC"), which defendants answered without moving to dismiss.   According to the CAC, on the morning of November 15, 2011, Bogart was on the

sidewalk of Cedar Street adjacent to Zuccotti Park. (See CAC ¶¶ 16, 17, 24.) NYPD officers were refusing to allow people to enter the Park, which was surrounded by police barricades. (See id. ¶¶ 20, 21.) Holding a copy of the TRO, Bogart told police officers that she disapproved of their refusal to obey a court order and to let her and others enter the Park. (See id. ¶¶ 22, 23, 25.) As recited in the CAC, an NYPD officer, believed to be Grenier, "[w]ithout provocation or warning," "reached over the barricade and punched plaintiff in the face." (Id. ¶ 26.)

Pursuant to 42 U.S.C. § 1983, the CAC alleges violations of Bogart's First Amendment rights on a theory that Grenier retaliated against Bogart for her statement criticizing the police (see id. ¶¶ 38-46); Bogart's Fourth Amendment rights, on a theory that Grenier used excessive force (see id. ¶¶ 47-50); and Bogart's Fourteenth Amendment rights, on a theory that Grenier's action shocks the conscience (see id. ¶¶ 51-56). The CAC also asserts supplemental state law claims against Grenier, and against the City on a respondeat superior theory (see id. ¶¶ 57-81).

**B.   The Proposed Second Amended Complaint**

Bogart's Proposed Second Amended Complaint would join the City Officials as defendants (see PSAC ¶¶ 11-13) and would add principally the following factual allegations. Although Mayor

Bloomberg had intended to announce at the 8:00 a.m. press conference that "the Park had been reopened," instead he and the two other City Officials "collectively decided that the City would keep the Park closed in violation of the court order." (Id. ¶¶ 30, 32.) At the press conference, the Mayor "acknowledged that the City was then ready to reopen the Park but would not do so because of the court order." (Id. ¶ 33; see also id. ¶ 34.) The NYPD carried out the City Officials' decision, preventing Bogart from entering the Park. (See id. ¶¶ 35, 36.)

The PSAC would assert the following § 1983 claims in addition to those in the CAC. First, the PSAC would add a new claim against the City Officials for violating Bogart's First Amendment rights by "prevent[ing] [her] from entering Zuccotti Park and exercising her First Amendment rights." (PSAC ¶ 60.) Second, the PSAC would amend the existing Fourth and Fourteenth Amendment claims to name the City Officials in addition to Grenier, on the theory that their decision to keep the Park closed caused Grenier to punch Bogart. (See PSAC ¶¶ 66-67, 73-74.) Finally, the PSAC would add a Monell claim against the City on the ground that the City Officials acted as municipal

policymakers when they decided to keep the Park closed. (<u>See</u> PSAC ¶¶ 77-79.)[5]

## C.   The Instant Motion for Leave to Amend

Following a series of pre-motion letters, the instant motion for leave to amend was filed on January 28, 2015, and was fully briefed on March 13, 2015. The Court heard oral argument on April 8, 2015. On April 16 and 17, 2015, the parties submitted supplemental letters.

## II. LEGAL STANDARD

Rule 15 of the Federal Rules of Civil Procedure provides that a district court "should freely give leave [to a party to amend its pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "[a] district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 200 (2d Cir. 2007); <u>see</u> <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962).

A proposed amendment is futile, and thus need not be permitted, "if it does not state a claim upon which relief can be granted." <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 941 F.2d 119, 123 (2d Cir. 1991). "The adequacy of a proposed amended

---

[5]    There are other differences between the CAC and the PSAC, but those differences are immaterial to the instant motion.

complaint to state a claim is to be judged by the same standards as those governing the adequacy of a filed pleading." Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012). Thus, to evaluate the adequacy of claims in a proposed amended complaint, we follow the familiar standards applicable to a Rule 12(b)(6) motion to dismiss for failure to state a claim, "accepting as true all factual allegations in the complaint, and drawing all reasonable inferences in the plaintiff's favor." Barrows v. Burwell, 777 F.3d 106, 111 (2d Cir. 2015). However, "we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). The proposed amended "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).

In evaluating the sufficiency of a pleading to state a claim, a "court may consider the facts alleged in the pleadings, documents attached as exhibits, and documents incorporated by reference in the complaint," DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010), as well as "matters of which judicial notice may be taken," Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991).

### III. DISCUSSION

Defendants oppose the proposed amendment only insofar as it would join the City Officials as individual defendants. Defendants do not oppose any other aspect of the proposed amendment, and expressly waive objection to the proposed amendment insofar as it would plead a <u>Monell</u> claim. (<u>See</u> Defs.' Mem. 1.)  Accordingly, leave to amend is granted as to the unopposed portions of the proposed amendment.  <u>See</u> Fed. R. Civ. P. 15(a)(2).[6]

Turning to the contested portions of the amendment, we reject the City's challenge to Bogart's Article III standing. As discussed below, Bogart's proposed Fourth and Fourteenth Amendment claims raise questions of proximate causation and vicarious liability, but these questions are distinct from the jurisdictional issue of constitutional standing.  <u>See</u> <u>Lexmark Int'l, Inc. v. Static Control Components, Inc.</u>, 134 S. Ct. 1377, 1391 n.6 (2014) (holding that "[p]roximate causation is not a requirement of Article III standing"); <u>Merriam v. Demoulas</u>, No. 11 Civ. 10577 (RWZ), 2013 WL 2422789, at *4 (D. Mass. June 3, 2013) (holding that vicarious liability is consistent with Article III standing); <u>Mastafa v. Australian Wheat Bd., Ltd.</u>,

---

[6]    No indication is intended as to whether the unopposed portions of the proposed amendment either state a claim upon which relief can be granted or are likely to survive a motion for summary judgment.

No. 07 Civ. 7955 (GEL), 2008 WL 4378443, at *2 (S.D.N.Y. Sept. 25, 2008) (same).   Likewise, Bogart's First Amendment claim poses no jurisdictional difficulty:   Bogart did not need to try to cross the police line to establish injury in fact when she was denied access to Zuccotti Park.   See Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2342 (2014) (holding that an individual need not risk "actual arrest" to challenge the "threatened enforcement of a law"); Jones v. Schneiderman, No. 11 Civ. 8215 (KMW), 2015 WL 1454529, at *3, ___ F. Supp. 3d ___, ___ (S.D.N.Y. Mar. 31, 2015) ("In general, the threat of a criminal prosecution based on a plaintiff's prospective conduct may create an injury in fact, where the threat qualifies as 'imminent.'").

However, for the reasons that follow, the PSAC fails to state a Fourth or Fourteenth Amendment claim against the City Officials, and the City Officials are entitled to qualified immunity from suit on Bogart's First Amendment claim. Therefore, the proposed amendment is futile insofar as it joins the City Officials as defendants.

## A.  Proposed Fourth and Fourteenth Amendment Claims

The premises of the CAC's Fourth and Fourteenth claims against Grenier are that in punching Bogart, Grenier used unconstitutionally "excessive force" and acted so as to "shock

the conscience." (CAC ¶¶ 48, 53.) The PSAC seeks to extend these same claims to the City Officials on the theory that, because Grenier punched Bogart while carrying out the City Officials' decision to keep the Park closed, that decision "directly caused" Bogart's physical injury. (Pl.'s Mem. 13; see PSAC ¶¶ 62, 67.) These allegations fail to state a § 1983 claim against the City Officials for at least two reasons.

First, even assuming that Grenier was a subordinate of the City Officials, it is blackletter law that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates." Iqbal, 556 U.S. at 676; see, e.g., Poe v. Leonard, 282 F.3d 123, 140 (2d Cir. 2002). Instead, individual liability under § 1983 depends upon "personal involvement of defendants in alleged constitutional deprivations." Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (internal quotation marks omitted). Here, Bogart fails to plead personal involvement of the City Officials in Grenier's alleged decision to punch Bogart, undoubtedly because there is no factual support for any such personal involvement.[7]

---

[7]    Aside from personal involvement, supervisory liability may be found where a defendant (1) knowingly fails to remedy a constitutional violation, (2) created a policy or custom under which unconstitutional practices occurred, (3) was grossly negligent in supervising the subordinate who committed the constitutional violation, or (4) exhibited deliberate indifference to reported unconstitutional practices. See Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 127 (2d Cir. 2004). None of these theories of supervisory liability apply here.

Second, a § 1983 plaintiff must show that "the defendant's action was a proximate cause of the plaintiff's injury." Gierlinger v. Gleason, 160 F.3d 858, 872 (2d Cir. 1998). The concept of proximate causation includes "the requirement that there be some direct relation between the injury asserted and the injurious conduct alleged." Legal Aid Soc'y v. City of N.Y., 114 F. Supp. 2d 204, 215 (S.D.N.Y. 2000) (internal quotation marks omitted). Thus, "[e]ven if a Section 1983 defendant's initial act is the 'but for' cause of some ultimate harm (i.e., the harm would not have happened but for the initial act), he is not legally liable for the harm if an intervening act is a 'superseding cause' that breaks the legal chain of proximate cause." Deskovic v. City of Peekskill, 673 F. Supp. 2d 154, 161 (S.D.N.Y. 2009) (brackets and other internal quotation marks omitted) (quoting Higazy v. Templeton, 505 F.3d 161, 181 (2d Cir. 2007)). Here, although the City Officials' decision to keep Zuccotti Park closed after 8:00 a.m. was part of the chain of causation that, according to Bogart's allegations, led to the physical contact between Grenier and Bogart later that morning, there was hardly a "direct" relationship between that decision and the "punch." Moreover, granting that it was foreseeable to the City Officials that NYPD officers would enforce their decision to keep the Park closed, Grenier's allegedly excessive and shocking use of force was a

superseding cause of any resulting physical injury.   See Deskovic, 673 F. Supp. 2d at 161 ("Generally, an intervening intentional or criminal act is a type of superseding cause that severs the liability of the original tort-feasor." (internal quotation marks omitted)).   Any other conclusion would impermissibly hold municipal leaders vicariously liable for a constitutional tort committed by a line officer simply because it took place during an operation directed by leadership.

In sum, due to the failure to plead personal involvement or proximate causation, the PSAC fails to state a Fourth or Fourteenth claim against the City Officials.


**B.  Proposed First Amendment Claim**

The theory of Bogart's proposed First Amendment claim against the City Officials is that their decision to keep the Park closed after it was cleaned was an "arbitrary and capricious" restriction on speech (Pl.'s Mem. 12), "based only on the animus of [the City Officials] to the protestors" (Pl.'s Reply Mem. 4).   Bogart expressly disclaims any challenge to the City's "initial closing of the Park" and concedes that it "may have been rational."   (Pl.'s Reply Mem. 3.)   Her claim fails because the City Officials are entitled to qualified immunity from suit.

The doctrine of qualified immunity "shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The Supreme Court "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam); see, e.g., Garcia v. Does, 779 F.3d 84, 97 (2d Cir. 2014) (upholding qualified immunity on pre-discovery motion to dismiss). A court may uphold a qualified immunity defense simply by concluding that the supposed constitutional right on which the plaintiff relies was not clearly established at the time of the governmental officials' actions. See Pearson v. Callahan, 555 U.S. 223, 236 (2009); Zalaski v. City of Hartford, 723 F.3d 382, 388-89 (2d Cir. 2013).

For a constitutional right "[t]o be 'clearly established,' '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Winfield v. Trotter, 710 F.3d 49, 53 (2d Cir. 2013) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "Whether a reasonable officer would know his or her

conduct to be unlawful requires an inquiry into the state of the law at the time of the conduct and 'in light of the specific context of the case.'"   Walczyk v. Rio, 496 F.3d 139, 166 (2d Cir. 2007) (Sotomayor, J., concurring) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).   "Courts 'do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'"   Walker v. Schult, 717 F.3d 119, 125-26 (2d Cir. 2013) (quoting al-Kidd, 131 S. Ct. at 2083).

Here, the question is whether there was clearly established First Amendment rule that prohibited the City from keeping a privately owned public space ("POPS") closed to the public during a brief period when the City was waiting to be heard in state court on the question of whether it could enforce the POPS owner's rules against camping, sleeping, and storing personal property.   For at least two reasons, no such rule existed.

First, there was no rule clearly establishing that the First Amendment applies in a POPS such as Zuccotti Park.   As a general matter, "owners of private property are . . . permitted to exclude strangers without First Amendment limitations," Rodriguez v. Winski, 973 F. Supp. 2d 411, 419 (S.D.N.Y. 2013); see, e.g., Hudgens v. N.L.R.B., 424 U.S. 507, 513 (1976); Kalfus v. N.Y. & Presbyterian Hosp., 476 F. App'x 877, 879-80 (2d Cir. 2012); Hotel Emps. & Rest. Emps. Union, Local 100 v. City of

16

N.Y., 311 F.3d 534, 543 (2d Cir. 2002).   The Court has searched in vain for a judicial decision, rendered either before or after November 15, 2011, holding that the First Amendment restricts a New York POPS owner's freedom to establish rules restricting expressive conduct.[8]

Second, even assuming that Zuccotti Park was a forum in which the First Amendment applied, the law is clear that "the right to use public forums . . . for speech and assembly is not absolute." United for Peace & Justice v. City of N.Y., 323 F.3d 175, 176 (2d Cir. 2003) (per curiam).   First Amendment doctrine divides public forums into "traditional public forums," "designated public forums," "limited public forums," and "nonpublic forums."   See, e.g., Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 341-42 (2d Cir. 2010) (per curiam). In traditional public forums, "[s]peech finds its greatest protection."   Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir. 2004).   "Even in public forums, however, the government may impose reasonable content-neutral restrictions on the time, place, or manner of protected speech."   Lederman v. N.Y.C. Dep't of Parks & Recreation, 731 F.3d 199, 202 (2d Cir.

---

[8]     A few recent decisions, all of which involve the Occupy movement and postdate the events of November 15, 2011, have assumed, but have not clearly held, that the First Amendment applies.   See, e.g., Lebowitz v. City of N.Y., 606 F. App'x 17, 17-18 (2d Cir. 2015); Waller, 933 N.Y.S.2d at 544.   Cf. Rodriguez v. Winski, 973 F. Supp. 2d at 420 (holding that the First Amendment did not apply to the owner of One Chase Manhattan Plaza in part because that property was not a POPS).

2013), cert. denied, 134 S. Ct. 1510 (2014); see, e.g., Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).  However, such restrictions must (1) be narrowly tailored to serve a significant government interest and (2) leave open ample alternative channels for communication.  See Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011); Deegan v. City of Ithaca, 444 F.3d 135, 142 (2d Cir. 2006); see also Zalaski v. City of Bridgeport Police Dep't, 613 F.3d at 341 (same test applies to designated public forums).

A restriction on expressive activity "is content neutral when it is 'justified without reference to the content of the regulated speech.'"  Marcavage v. City of N.Y., 689 F.3d 98, 104 (2d Cir. 2012) (quoting City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48 (1986)); see, e.g., Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984); Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 647-48 (1981).  A facially neutral restriction "does not become content based simply because it may disproportionately affect speech on certain topics."  McCullen v. Coakley, 134 S. Ct. 2518, 2531 (2014).

Here, assuming arguendo that Zuccotti Park was a traditional or designated public forum, and thus that the most

stringent First Amendment analysis applies,[9] the City Officials could reasonably have concluded that the decision to keep Zuccotti Park closed was content-neutral because of its justification to preserve the status quo in light of the new state-court litigation in which the City would seek to defend enforcement of the no-camping rules as reasonable health and safety regulations.   See Waller, 933 N.Y.S. at 545 (concluding that Brookfield's "rules appear[] reasonable to permit the owner to maintain its space in a hygienic, safe, and lawful condition" and that the City's "enforcement of law . . . promote[d] public health and safety").   The City Officials could also have reasonably believed that it would be inadvisable to do anything other than to preserve the status quo or to comply immediately with the TRO without first being heard in state court -- a neutral justification.   Further, the City Officials could have reasonably believed that, if they prevailed in state court (as they did within hours), their immediate compliance would have threatened public safety by placing the NYPD in the position of evicting Occupy campers for a second time.   (See Neufeld Dep. 52:20-23 ("[I]t would have created serious safety concerns to reopen the park, allow people back in with their things, only to then have a court say otherwise later that morning.").)

---

[9]     If Zuccotti Park were not so classified, then the City's actions would be judged against a less stringent First Amendment analysis.

Especially given the brief duration for which Zuccotti Park was closed during the City's nascent defense of the state-court litigation, the City Officials could reasonably have concluded that the closure was narrowly tailored to protect of public health and safety. See, e.g., McCullen, 134 S. Ct. at 2532 (acknowledging the legitimacy of governmental interest in public safety and preventing obstruction); Heffron, 452 U.S. at 650 (same); Marcavage, 689 F.3d at 104-05 (same). The City Officials also could reasonably have concluded that there were ample alternative channels of communication. No doubt Bogart and the unhappily evicted protesters were able to make themselves heard. In sum, the City Officials did not violate clearly established law.

To the extent that Bogart argues that her individual First Amendment claim to speech should be viewed in isolation from the activities of other Occupy-affiliated protesters, her argument conflicts with the law. See Heffron, 452 U.S. at 652 (holding that a First Amendment restriction "should not be measured by the disorder that would result from granting an exemption solely to [one plaintiff]"); Marcavage, 689 F.3d at 107 (rejecting argument that "justifications based on security and congestion [that] are premised on large numbers of protesters" should not apply to "just two people"). To consider Bogart's First Amendment claim in isolation from the undisputed context of the

events taking place at Zuccotti Park would be "to express the
First Amendment issue in unduly abstract terms." Occupy
Nashville v. Haslam, 769 F.3d 434, 444 (6th Cir. 2014).

Finally, Bogart argues that the TRO itself precludes
qualified immunity. We disagree. While courts deny qualified
immunity to officials who disobey a final and nonappealable
court order," Sloane v. Herman, 983 F.2d 107, 111 (8th Cir.
1993), the situation on the morning of November 15, 2011, is
quite distinct. A temporary order obtained on an ex parte
basis,[10] lacking findings of fact or law, and designed to last
for only five hours, hardly clearly establishes the existence of
a constitutional right, particularly in favor of a nonparty to
the litigation in which the order issued.

Qualified immunity is designed to "shield officials from
harassment, distraction, and liability when they perform their
duties reasonably," Pearson v. Callahan, 555 U.S. at 231, and to
"give[] government officials breathing room to make reasonable
but mistaken judgments about open legal questions," al-Kidd, 131
S. Ct. at 2085. The allegations of Bogart's proposed First
Amendment claim against the City Officials show neither that the
City Officials defied clearly established law nor that they
acted unreasonably. The City Officials are entitled to

---

[10]    Although defendants do not press the point in their briefing,
defendants have contended that it is improper for a state court to issue an
ex parte TRO against a municipality. Justice Stallman did not rule on that
question in Waller, and there is no cause to do so now.

qualified immunity from suit on that claim, and thus the portion of the proposed amendment that would assert a First Amendment claim against them is futile.[11]

## CONCLUSION

For the foregoing reasons, Bogart's motion for leave to amend is granted in part and denied in part.  Bogart may file a revised Second Amended Complaint that omits naming the City Officials as defendants.

The record reflects that defendants have requested leave to move for summary judgment, a request that has been deferred pending decision on the instant motion.  The parties are directed to confer and propose a schedule for briefing the proposed summary judgment motion, which may follow a brief period of further discovery if the parties agree that it is necessary.  Should the parties be unable to agree as to the need for further discovery before briefing on the summary judgment

---

[11]    It has not escaped observation that the only purpose that plaintiff's counsel has ever been able to articulate -- in pre-motion letters, two memoranda of law, oral argument, and a post-oral argument letter -- for proposing to join the City Officials as defendants is that punitive damages may be theoretically available against individual defendants but not against the City itself.  However, Bogart has struggled and ultimately failed to identify any comparable First Amendment case in which punitive damages have been awarded.  Nor do the circumstances surrounding the First Amendment issue -- as to which Bogart herself concedes that the initial decision to clear the Park "may have been rational" (Pl.'s Reply Mem. 3) -- arguably support punitive damages.  Thus, the proposal to join these defendants, which the Corporation Counsel would have a strong institutional incentive to resist under any administration, has never served to advance Bogart's interests in seeking redress for the harm that she allegedly suffered on the morning of November 15, 2011.

motion commences, then the party seeking discovery should submit a letter, to which the opposing party may respond, stating with particularity what further discovery is sought.[12]


Dated:      New York, New York
            August 25, 2015


                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE

---

[12]     Plaintiff's counsel is hereby advised that, because the City Officials would appear to have no unique personal knowledge relevant to the remaining issues in this case, the Court is strongly disinclined to permit their depositions.   See Lederman v. N.Y.C. Dep't of Parks & Recreation, 731 F.3d 199, 203 (2d Cir. 2013) (holding that "to depose a high-ranking government official, a party must demonstrate exceptional circumstances justifying the deposition -- for example, that the official has unique first-hand knowledge related to the litigated claims or that the necessary information cannot be obtained through other, less burdensome or intrusive means"), cert. denied, 134 S. Ct. 1510 (2014).

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

**Attorneys for Plaintiff**

Joshua S. Moskovitz, Esq.
Jonathan C. Moore, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue, PH Suite
New York, NY  10016

**Attorney for Defendants**

Andrew J. Lucas, Esq.
Office of the Corporation Counsel
100 Church Street
New York, NY  10007